# Illinois Official Reports

## Appellate Court

***Doe v. Township High School District 211*, 2015 IL App (1st) 140857**

| | |
|---|---|
| Appellate Court Caption | JANE DOE, Individually and as Legal Guardian of Jane Doe, Plaintiff-Appellee, v. TOWNSHIP HIGH SCHOOL DISTRICT 211, Defendant-Contemnor-Appellant (Tom McNamara, Theresa Busch and Jackie Gatti, n/k/a Jackie Zydek, Defendants-Contemnors; Michael E. Kujawa, Contemnor-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-0857 |
| Filed | June 5, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 12-L-2036, 13-L-4681, 13-L-4685, 13-L-4686, 13-L-4705; the Hon. Daniel T. Gillespie, Judge, presiding. |
| Judgment | Affirmed; civil contempt finding and the $500 fine vacated; and the case remanded for further proceedings consistent with this opinion. |
| Counsel on Appeal | Jay S. Judge, Michael E. Kujawa, and Erika G. Baldonado, all of Judge, James & Kujawa, LLC, of Park Ridge, for appellant.<br><br>Kevin J. Golden, of Dudley & Lake, LLC, of Chicago, and Lynn D. Dowd and Francis J. Leyhane III, both of Law Offices of Lynn D. Dowd, of Naperville, for appellee. |

Panel                 JUSTICE GORDON delivered the judgment of the court, with
                      opinion.
                      Justices McBride and Reyes concurred in the judgment and opinion.


**OPINION**

¶ 1        Plaintiff Jane Doe,[1] a special education student at Hoffman Estates High School, sued defendants Township High School District 211 (the District), two teachers and one principal, alleging negligence and willful and wanton conduct for their alleged failure to prevent another student from having sexual relations with plaintiff on multiple occasions.

¶ 2        In this appeal, the District and its attorney, Michael Kujawa, appeal a contempt order that was entered against all defendants[2] at their request. After an *in camera* review of certain documents, the trial court ordered Kujawa's client, the District, to produce two items which the District claimed were protected by the attorney-client and work-product privileges, and which the District refused to produce. The two items are: (1) the notes of Dr. Daniel Cates, the school's special education director, which he made while investigating claims of inappropriate sexual conduct at the school; and (2) a DVD with two video recordings made by Dr. Cates showing where some of the alleged conduct may have occurred.[3] In order to permit the District to appeal the trial court's discovery ruling, the trial court entered the contempt order[4] which is the subject of this appeal.

¶ 3        On this appeal, defendants ask this court: (1) to reverse the trial court's discovery order directing the District to produce the contested items; and (2) to vacate the contempt order and fine. In response, plaintiff argues: (1) this court should not consider defendants' claims because of, among other reasons, the appellate record is insufficient; (2) in the alternative, if we do address the merits of the appeal, we should affirm the trial court's discovery order; and (3) whether we affirm or reverse the discovery order, we should not vacate the contempt order and its nominal $500 fine.

¶ 4        For the following reasons, we could conclude, first, that defendants forfeited the discovery issue for appeal by failing to provide a sufficient record. Specifically, defendants failed to include the transcript of the hearing where the trial court ruled on the underlying discovery issue, which is the sole basis of the contempt order.

---

[1] Although the name "Jane Doe" is used to refer to both the abused student and her legal representative, in this opinion we will use the term "plaintiff" and "Doe" to refer to the student.

[2] Defendants' motion for contempt stated that it was filed by all defendants including not only the District but also the individual defendants, and it asked the trial court to hold both defendants and their counsel in civil contempt. The trial court's contempt order then granted defendants' motion. See *infra* ¶ 47 (discussing who was held in contempt).

[3] Although the parties and the trial court consistently refer to the video recording as singular, there are actually two recordings on the DVD in the sealed envelope in the appellate record.

[4] Although the trial court's February 21, 2014, written contempt order did not specifically state that it was a friendly contempt, the trial court described the order as being "held in friendly contempt."

¶ 5        However, we are inclined to decide this case on the merits, and the affidavits of Dr. Cates and the reasons stated by the trial court persuade us that the trial court's discovery order was proper. Lastly, we vacate the contempt order, in light of the fact that it was a friendly contempt based on a good faith effort by defense counsel to secure an interpretation of an issue to serve his client and the court.

¶ 6                                        BACKGROUND

¶ 7        Although the allegations of the underlying lawsuit are disturbing, what concerns us on this appeal is not the subject matter of the complaint but whether certain documents are protected by the attorney-client and work-product privileges. Thus, we set forth the allegations briefly and discuss at greater length the disputed items and the procedural history surrounding the trial court's order to produce them.

¶ 8                                        I. Pleadings
¶ 9                                        A. Complaint

¶ 10       Plaintiff, and other similarly situated students, initially filed suit in 2006. We discuss here plaintiff's most recent complaint which is her seventh amended complaint, filed on October 24, 2012. In this complaint, plaintiff made the following allegations.

¶ 11       Plaintiff was a developmentally disabled student who attended Hoffman Estates High School (Hoffman). All students enrolled in the special education program were also a part of the "Secondary Work Experience Program" (SWEP). The District had employees who were required to walk the SWEP students from class to class and through the buildings.

¶ 12       Defendants Tom McNamara and Jackie Zydek were teachers in the SWEP program at Hoffman, and defendant Theresa Busch was the principal at Hoffman, which was owned and managed by defendant District.

¶ 13       Christopher Girard, another student, was arrested by the Schaumburg police department and charged as an adult with aggravated criminal sexual assault of a minor child on July 21, 2004, while he was attending Hoffman; and defendants knew or should have known that Girard had been so charged. Defendants knew or should have known that Girard was sexually deviant, and that it was not safe for him to interact with developmentally challenged female students.[5] From July 2004 until October 2005, while attending Hoffman, Girard would expose his penis, masturbate, and touch the breasts, vaginas and buttocks of female students during class at Hoffman in view of his teachers, including defendants McNamara and Zydek.

¶ 14       From August 2005 to October 2005, plaintiff was a student in McNamara's physical science class, which was taught in the wrestling room; and she was sexually assaulted by Girard during McNamara's class. Girard assaulted her by touching her breasts, vagina and buttocks; by inserting his penis into her vagina and buttocks; and by making her touch his penis.

_____

[5]Although the complaint does not explicitly state that Girard was not a developmentally challenged student, that may be reasonably inferred from the allegation that he should not have been allowed to interact with "developmentally challenged female students."

¶ 15 On September 21, 2005, parents of another female student in the SWEP program informed defendant Zydek that there was a closet or room in the science room in which Girard would have sex with the girls during class, and that he also had sex with them in the gymnasium during the lunch period. Zydek said that she would talk to McNamara and others to determine if they noticed anything.

¶ 16 Plaintiff alleged that defendants acted negligently, as well as willfully and wantonly.

¶ 17 B. Defendants' Answer

¶ 18 In their answer to plaintiff's seventh amended complaint, defendant District admitted that it owned and operated Hoffman; that it employed defendants McNamara and Zydek who were teachers in the SWEP program; that defendant Busch was the principal at Hoffman; that plaintiff was a developmentally disabled student who was also a SWEP student at Hoffman; and that defendant McNamara taught some of his physical science classes between August and October 2005 in the wrestling room. Defendants also admitted that "on or about 9/21/05 [defendant] Zydek agreed to discuss with other District employees whether they had noticed anything unusual with [Christopher] Girard or students in the SWEP Program." Defendants denied most of plaintiff's other allegations.

¶ 19 Defendants asserted six affirmative defenses, which alleged either some form of immunity or no private right of action.

¶ 20 II. Dr. Cates' First Affidavit

¶ 21 The subject of this appeal concerns notes and two video recordings made by Dr. Daniel Cates, the District's director of special education. Discussing the creation and content of these items, Dr. Cates stated in an affidavit, dated January 16, 2014, that:

"1. In October 2005, I served as the Director of Special Education for Township High School District 211.

2. As the Director of Special Education, it was within my typical duty to perform requests made by the Superintendent, Dr. Roger Thornton, and to work with a number of different attorneys surrounding student matters.

3. Upon learning that one or more students with a cognitive impairment and served in the special education program at Hoffman Estates High School may have been engaged in sexual relations of any kind on the campus, I was asked by then-Superintendent Dr. Roger Thornton to investigate whether I could locate any information to indicate culpability or legal exposure on the District's part.

4. I was asked to gather and record a complete understanding of what had happened surrounding the report that multiple students had been involved in a matter of sexual relations taking place on the campus of Hoffman Estates High School and to provide a summary of my findings to the following individuals: Superintendent, Dr. Roger Thornton; Associate Superintendent, Mr. David Torres; and legal counsel, Mr. Mike Kujawa[.]

***

6. My investigation included multiple interviews with staff members at Hoffman Estates High School for the following purposes related specifically to potential legal exposure and scrutiny in any potential lawsuit ***:

(a) To understand the manner in which students from the junior highschools were reviewed and recommended for certain programs ***and specifically into the special education program at Hoffman Estates High School;

(b) To understand and record the sequence of actions and traffic patterns that students likely followed in order to engage in the alleged behavior on the campus of Hoffman Estates High School;

(c) To review the manner in which lower-functioning students' whereabouts are known, tracked or recorded, specifically during the lunch period at Hoffman Estates High School.

7. Following my interviews, I met with Dr. Thornton, Mr. Torres and Mr. Kujawa in the superintendent's conference room to summarize what I had gathered and learned.

8. It has been my practice to record personal notes on yellow legal-style notepads or personal stationery, when available.

* * *

11. In addition, I created a video file of the pathway that I believed the student might have taken in order to get to the location where the alleged events were reported to have taken place. This video was shared one time only during the summary meeting held with Dr. Thornton, Mr. Torres and Mr. Kujawa.

***

13. My notes were stored in *** the same location in my office from the time they were created until the time they were provided to legal counsel. At no time were my notes or yellow notepads stored with other typical student records ***.

14. My involvement in the case also involved direct contact with families, staff members from the Children's Advocacy Center and staff members from a variety of special education programs for the purpose of offering assistance to the students reported to have been involved ***.

* * *

17. In no way or at any time was there ever any reference on the part of Dr. Thornton or anyone from the District to create any association between any pending lawsuit and my attempts to locate and the District's offer to provide therapeutic services from the Children's Advocacy Center, any special education program or any private therapeutic service or program."

Plaintiff disputes whether this affidavit was considered by the trial court because the affidavit bears no file stamp indicating receipt by the trial court, and the affidavit is also not attached to a file-stamped document.

However, neither party disputes the basic thrust of the document, which is that Dr. Daniel Cates was instructed by his supervisor to investigate the facts surrounding claims of inappropriate sexual conduct and that he then reported these findings to his supervisor, as well as to an associate superintendent and the District's attorney. Cates does not claim that his actions were prompted by or directed toward claims made by plaintiff or her family. He does state that his involvement in the case is twofold: (1) to "locate any information to indicate culpability or legal exposure on the District's part"; and (2) also "for the purpose of offering assistance to the students reported to have been involved."

¶ 24    Other than stating that he was the special education director in October 2005, Cates' affidavit does not provide any dates. While the Cates' affidavit lacks dates, there are some dates provided in the privilege log, discussed below.

¶ 25                                    III. Privilege Log

¶ 26    Defendants submitted an "Amended Privilege Log" to the trial court on January 22, 2014. The log contains a column on the left for "Bates Page Numbers," and a column on the right for "Description of Document."

¶ 27    The descriptions state: (1) that pages 1 through 144 are the "[p]ersonal notes of Dan Cates"; (2) that pages 145 through 156 are the "personal notes of Timothy Little, Assistant Principal for District 211"; and (3) that page 157 is an email from Superintendent Thornton to Cates.

¶ 28    There are 33 separate "descriptions" on the privilege log for the Cates documents. However, the descriptions are identical, with only the dates changing. The descriptions state:

> "Personal notes of Dan Cates, Director of Special Education for District 211, regarding his personal *fact-finding mission* into the alleged events, including but not limited to: conversations with various faculty and staff members and his thoughts and impressions regarding the same. They were created for his exclusive use and benefit, were not distributed to any third parties, were made in anticipation of litigation, and were kept in his personal file at District 211 ([date])." (Emphasis added.)

¶ 29    In the privilege log, as quoted above, defendants acknowledge, as they did in his affidavit, that Dr. Cates was on a "fact-finding mission." Although the privilege log states that it lists the items for which "defendants claim privilege" and defendants repeatedly asserted that Cates' notes were protected by the work-product and the attorney-client privileges and the log repeatedly states that each item was created "in anticipation of litigation," the log itself does not reiterate the specific privileges.

¶ 30    The log provides the dates of Cates' notes as ranging from September 20, 2005, through September 17, 2007. Thus, Cates' notes began when the conduct was allegedly still occurring, since plaintiff's complaint alleged that the conduct at issue occurred between August and October 2005. In addition, the log dates Cates' notes as starting on September 20, 2005, which is the day before parents notified defendant Zydek. Plaintiff's complaint alleges that parents of another SWEP student notified defendant Zydek on September 21, 2005, of inappropriate conduct by Girard; and defendant's answer admitted that, on September 21, defendant "Zydek agreed to discuss with other District employees whether they had noticed anything unusual" with respect to Girard and students in the SWEP program. Cates' notes started before this notification of Zydek. The notes also started before plaintiff or other similarly situated students filed suit, which occurred in 2006.

¶ 31    In addition to Cates' notes, the log also lists: (1) the "[p]ersonal notes of Timothy Little, Assistant Principal for District 211," which are pages 145 through 156; (2) email correspondence from Superintendent Thornton to Cates, dated October 6, 2005, which is page 157; and (3) a video recording made by Cates, which is undated in the log. We digress for a moment to address the issue of Little's notes and Thornton's email, since the parties refer repeatedly to all of these 157 pages as Cates' notes.

¶ 32    While the trial court's discovery and contempt orders refer only to Dr. Cates' "notices and video,"[6] we lack the transcript of the January 31, 2014, hearing, where the trial court issued its discovery ruling, to know whether the intent of the court was to include pages 145 through 157 which are, according to the privilege log, Little's notes and Thornton's email. The parties' intent appears to have been to include these documents as part of Cates' notes, since the supplemental record on appeal contains a "Master List of Documents," apparently prepared by defendants, which states that all 157 pages are Cates' personal notes and are at "issue in this appeal."[7] This list is quoted below, in the section on the appeal. However, defendants assert in their brief to this court that plaintiff sought and defendants produced all the notes of the four assistant principals, which includes Little. To the extent that defendants intended to challenge on this appeal the release of Little's notes and Thornton's email to Cates, that issue is waived for our review, as we explain in our analysis below.

¶ 33    The log is attached to a letter, dated January 22, 2014, which stated that defendants were providing a courtesy copy to the court of "Defendants' Amended Privilege Log and Documents," and the "Video recording by Dr. Daniel Cates." The bottom of the letter states: "cc w/o Privilege Log Documents & Video Recording enclosures: Kevin Golden[,] Catherine Massarelli," the Doe attorneys. This notation indicates receipt of the log by plaintiff, but without the actual documents and video recording provided to the trial court.

¶ 34                        IV. The Trial Court's Discovery Order

¶ 35    On January 31, 2014, the trial court entered a discovery order which stated:
    "IT IS HEREBY ORDERED:
        (1) The Court finds that the notes of Dr. Daniel Cates were done as fact-finding and, therefore, are not privileged and should be turned over in 14 days on or before February 14, 2014;
        (2) The Court finds the notes of Dr. Daniel Cates were done as fact-finding and, therefore, are not privileged with the exception of pages 47-51, 68, 86-87, 103, 105 & 144, which the Court is requiring Dr. Cates to produce an affidavit stating whether the pages are regarding his conversations w/Mike Kujawa in full. Remaining pages to be turned over within 14 days on or before February 14, 2014;
        (3) The video recording by Dr. Daniel Cates was done as part of his fact-finding and, therefore, is not privileged and should be turned over on or before 14 days or by February 14, 2014; and
        (4) Plaintiff's Motion for Sanctions is denied but Defense Counsel is advised to abstain from any further speaking objections during the remaining depositions."

¶ 36    In her appellate brief, plaintiff observes: (1) that a hearing was held on January 31, 2014, and (2) that the appellate record does not contain a transcript for it. In their reply brief, defendants do not deny this assertion. Thus, the appellate record fails to contain a transcript

---

[6]Although the contempt order, dated February 21, 2014, refers to "notices and video," the trial court, in all probability, meant to say notes and video.

[7]Similarly, defendants' brief on appeal refers repeatedly to Cates' "157 pages of personal, confidential notes."

or bystander's report for the hearing where the trial court decided the underlying discovery issue.

¶ 37 Addressing this absence in their appellate brief, defendants state: "The Record on Appeal contains the transcript of the [February 21, 2014,] hearing before the trial court on *** Defendants' motion for friendly contempt. At the time, as the [February 21] transcript reflects, the trial court knew its prior ruling ***." The brief then quotes the trial court as stating: "I think I took out anything that I saw that involved consultations with your firm." No further explanation is offered for the absence of a transcript or bystander's report for the January 31, 2014, hearing where the issues, that are now before us on review, were decided by the trial court.

¶ 38                                 V. Dr. Cates' Second Affidavit

¶ 39 In the January 31, 2014, discovery order, the trial court ordered Dr. Cates to submit an affidavit with respect to pages 47 through 51, 68, 86 through 87, 103, 105 and 144. In response to this order, Dr. Cates stated in an affidavit, dated February 11, 2014:

"1. I affirm that I was the author of each of the enclosed notes.

2. I wrote each of the notes contemporaneously with conversations I had with different people.

3. The pages are numbered in the lower right hand corner.

4. I affirm the following:

–I wrote the notes contained on pages 047,048,049, 051.

–I wrote each of these notes specifically as part of client attorney privilege for the purpose of legal consultation and liability protection with Mike Kujawa or Nike Nugent.

–I wrote the notes on the top of page 068 during a telephone conversation I had with the parent of [CK] regarding a potential transfer to the school to which [CK] was eventually transferred.

–I wrote the notes on pages 086, 087, 103, 105, 144 specifically as part of client-attorney privilege for the purpose of legal consultation and liability protection with Mike Kujawa."

¶ 40 In this affidavit, Cates appears to affirm that he is "the author of each of the [157 pages of] enclosed notes," despite the fact that the amended privilege log, dated January 22, 2014, describes pages 145 through 156 as the personal notes of Assistant Principal Little, and page 157 as an email from Superintendent Thornton.

¶ 41 The same problems exist with this affidavit as with Cates' January 16, 2014, affidavit. Plaintiff disputes whether the February 14, 2014, affidavit was considered by the trial court because the February 14 affidavit bears no file stamp indicating receipt by the trial court, and the affidavit is also not attached to a file-stamped document.

¶ 42 However, plaintiff does not contest on this appeal the trial court's ruling with respect to these few documents, so the factual assertions contained in the February 14 affidavit are not necessary to our resolution of this appeal.

## VI. Defendants' Motion to Be Held in Contempt

¶ 44    On February 14, 2014, defendants filed a motion asking the trial court to hold them in contempt of court. The motion stated that it was filed by all defendants including not only the District but also the three individual defendants. Defendants asked the court to hold both them and their counsel in civil contempt pursuant to *Norskog v. Pfiel*, 197 Ill. 2d 60 (2001), and Illinois Supreme Court Rule 304(b)(5) (Ill. S. Ct. R. 304(b)(5) (eff. Feb. 26, 2010) ("[a]n order finding a person or entity in contempt of court which imposes a monetary or other penalty" is immediately appealable without a special finding)). Defendants stated that they sought to be held in contempt so that they could take an immediate interlocutory appeal from the trial court's January 31, 2014, discovery order. Specifically, defendants stated:

> "Now come the Defendants, Township High School District 211, Tom McNamara, Theresa Busch, Jackie Gatti, n/k/a Jackie Zydek (hereinafter referred to collectively as the 'District'), by and through their attorneys, Judge, James and Kujawa, L.L.C. *** [who] respectfully request that this Court hold the District (and its counsel) in civil contempt of court ***."

¶ 45    In her appellate brief, plaintiff observes that a hearing was held on February 14, 2014, and that the appellate record does not contain a transcript or bystander's report for it. In their reply brief, defendants do not deny this assertion.

## VII. The Trial Court's Contempt Order

¶ 47    On February 21, 2014, the trial court entered an order, which stated in relevant part:

> "IT IS ORDERED:
>
> –Plaintiffs' Motion for sanctions is denied.
>
> –Defendants' Motion to be held in civil contempt of Court for failure to comply with the Court's 1/31/14 discovery order to produce Dr. Daniel Cates' handwritten notices and video is granted. This Court finds the Defendants in civil contempt of Court and thereby imposes a monetary contempt citation in the amount of $500.00, payment of which is stayed pending Defendants' appeal pursuant to S. Ct. R. 304(b)(5).
>
> –Discovery to continue, with the timing of Dan Cates' deposition reserved for future ruling."

¶ 48    Although the trial court's order did not explicitly state that attorney Michael Kujawa was also held in contempt, the order states that defendants' motion is granted and defendants' motion explicitly asked for both defendants and their attorney to be held in contempt. Thus, the trial court's order holds both defendants and their attorney in contempt, as they requested. Since defendants' motion stated that it was filed on behalf of not only the District but also the three individual defendants, the individual defendants are also included among the "defendants" held "in contempt" by the trial court's order.

¶ 49    The transcript of the February 21, 2014, hearing is the only transcript in the record on appeal. At the beginning of the hearing, plaintiff's counsel summarized the events of the prior few weeks, stating: that, on January 31, 2014, after an *in camera* inspection[8] of the

---

[8]Plaintiff's counsel also repeated later in the proceeding that the trial court "did an *in camera* review of the records."

disputed items, the trial court had entered an order directing defendants to produce Dr. Cates' notes and video; that, on February 5, 2014, defense counsel sent a letter stating defendants were not going to comply with the order; that on February 11, 2014, Erica Maldonado, an associate in Kujawa's firm, stated that she would not proceed with depositions unless plaintiff waived her right to the disputed items; that later on February 11, plaintiff's counsel informed Kujawa that plaintiff intended to file a motion for sanctions and not for friendly contempt; that, on February 13, plaintiff filed a motion for sanctions and defendants filed an emergency motion for friendly contempt which they noticed for February 14; and that, on February 14, both parties appeared and the trial court struck defendants' motion on the ground that it was not an emergency. After the emergency motion was stricken, defendants filed another contempt motion on February 14, which the trial court heard on February 21.

¶ 50        On February 21, the two issues before the trial court were plaintiff's motion for sanctions, and defendants' motion for friendly contempt. Plaintiff's motion asked the trial court to issue sanctions for defendants' disregard of the January 31 discovery order. Plaintiff also argued that defendants were not acting in good faith when they filed their "emergency" motion for contempt, since it was prompted by the knowledge that plaintiff was about to file a motion for sanctions. In response, defendants asked for a friendly contempt order for the purpose of allowing them to appeal the prior January 31 discovery order, and they suggested in their motion that the court set a $25 contempt fine.

¶ 51        At the February 21 hearing, Kujawa argued that his "conversations with Dr. Cates are contained within those notes that counsel seeks to have produced." To which the trial court responded:

> "THE COURT: Just a second. I think I took out anything that I saw that involved consultations with your firm. I think I told [your associate] that last time
>
> KUJAWA: Yes, you did.
>
> THE COURT: So it's nothing involving a direct conversation between you as the attorney and the client in what I ordered to be turned over."

¶ 52        The trial court then issued the following ruling concerning both sanctions and contempt:

> "THE COURT: Talking about sanctions, [Supreme Court Rule] 219(c)[9] gives a lot of discretion to the trial judge, and this trial judge has the authority to control discovery; and in this case I'm very disappointed in my efforts because it's been seven years it appears since the incident occurred and we're still talking about discovery, and that's proceeding at a glacial pace. And now one of the parties wants to have it go back to the Appellate Court for a second time.[10] That's very disappointing.

---

[9]Supreme Court Rule 219(c) provides that, when a party fails to comply with a discovery order of the trial court, the court may take a number of different actions, including ordering a monetary penalty or holding the party in contempt. Ill. S. Ct. R. 219(c) (eff. July 1, 2002).

[10]In *Jane Doe v. Village of Schaumburg*, 2011 IL App (1st) 093300, this court affirmed the trial court's dismissal of plaintiff's claims against defendants Village of Schaumburg, the Schaumburg police department, several Schaumburg police detectives, the Village of Hoffman Estates and the Hoffman Estates police department. But see *Payne v. City of Chicago*, 2014 IL App (1st) 123010, ¶ 45 (observing that *Ries v. City of Chicago*, 242 Ill. 2d 205, 227 (2011), "expressly overruled *Doe*'s holding that section 2-202 provided a general willful and wanton exception to the other immunity provisions in

- 10 -

So when I read the chronology that plaintiff set out where Ms. Maldonado [an associate in the Kujawa firm] refused to comply with my order, I was very, very disappointed. And but as counsel for the School District explains, he did that because he wanted–he intended right then within six days of the order to appeal it, and that's why he instructed Erica Maldonado not to tender those documents because he wants to appeal that, but he would be happy to do the deps without them.

So reading it from plaintiff's point of view, I can see how they got extremely upset as I did. It looks like Erica Maldonado just felt she wasn't going to do what she was ordered to do and work her way around it, but I see that the School District had decided to appeal it, and because they want to appeal it, they are happy to finesse that by doing the dep without tendering the documents but they absolutely do not want to comply with that discovery order. So that's the reason why they delayed.

So I don't think that would be sanctionable, ***. Here they did it within six days. So they made the decision fairly promptly. I just wish they hadn't. I wish they just complied with the order because I think it's the–it's analogous to the Sailor report[11] and the Supreme Court['s] *Consolidation* [*Coal*] case where there is some type of an industrial accident. They commissioned Sailor, the engineer at Consolidation [Coal], to examine and they did and that was discoverable.

Likewise here, the superintendent of the School District, realizing–him being a very competent individual and experienced and wise, realizing how important it was directed Cates[,] to his person in charge of special ed for the district[,] to find out why somebody with a 90 IQ was mixed in with these other[ ] students and to conduct a complete investigation. *** [T]he school district chief ordered his special ed chief to conduct an investigation. This was at the direction of the superintendent of schools to investigate this incident, and this is his report, and I think they're discoverable.

So as to sanctions, I think the reason that defendants were not in compliance [was] because they had a good faith belief that they should not have to tender them and that the Appellate Court would substantiate that and, therefore, I'm going to deny the plaintiff's request for sanctions.

That leaves the petition for contempt. The defendant wants a friendly contempt. The defendant wants a friendly contempt so the Appellate Court can review this. Plaintiff is not agreeing to the friendly contempt and says it's a delaying tactic. Nonetheless, the Appellate Court has held that refusing to tender documents ordered by the Court and asking to be held in contempt which has been described as friendly contempt is a proper way to challenge a discovery order.

Although discovery orders are, as plaintiff points out, not generally appealable, if a party is ordered to do something and refuses to do that and is then held in friendly contempt, that allows them to appeal under [a] Supreme Court rule as counsel said. I think it's [Rule] 304(b).

---

the [Local Governmental and Governmental Employees Tort Immunity] Act" (745 ILCS 10/1-101 *et seq.* (West 2006)).

    [11]The Sailor report was discussed in the Illinois Supreme Court case of *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103 (1982), which we discuss later in our Analysis section.

So I would be inclined to accept counsel's representation that he is not going to comply and find the school district in contempt and enter a $500 fine for contempt and have that stayed pending appeal."

¶ 53                                    VIII. The Appeal

¶ 54    On March 18, 2014, the District and its attorney, Michael Kujawa, filed a notice of appeal which stated that they were appealing both the trial court's January 31, 2014, discovery order and the trial court's February 21, 2014, contempt order. The three teachers did not file a notice of appeal, and they were not named as appellants in the March 18, 2014, notice filed by the District and Kujawa. Thus, the teachers are not parties to this appeal, and Kujawa and the District are the sole appellants.

¶ 55    Defendants moved before the trial court to allow the clerk of the circuit court to unseal the file and to prepare a limited record on appeal. However, on April 15, 2014, the trial court issued an order which stated:

> "Defendant's Motion to Prepare a Limited Record on Appeal is denied. The Clerk of the Circuit Court is allowed to unseal the entire record for the purpose of preparing the entire file for the Record on Appeal and to allow the filing of the entire record on appeal."

¶ 56    On April 28, 2014, defendants filed a "Request for Preparation of Record on Appeal," which "designated" 19 items as "necessary," including the two Cates' affidavits, discussed above. Defendants' request contained a list of the 19 items, with the words "(not attached)" next to only the nineteenth item on the list. If the other 18 items were originally attached to this list, they are no longer attached in the appellate record.

¶ 57    On May 8, 2014, defendants filed a motion for leave to file a limited record with the appellate court, which this court denied on May 21, 2014. On July 18, 2014, defendants filed a 39-volume record; and on October 22, 2014, they filed a supplemental record which included photocopies of the disputed notes and a DVD of the video recordings.

¶ 58    The supplemental record states in several places that all 157 pages are Cates' personal notes. First, in the sealed envelope, there is a title page immediately preceding the photocopied notes which states: "Personal Notes of Dr. Daniel Cates–157 pages–Claimed Privileged." This statement is also repeated on the outside of the sealed envelope. Second, the supplemental record contains a "Master List," which is included twice, both in the bates-stamped record and inside the sealed envelope. This list is entitled: "Master List of Documents Constituting Supplement Record (Thursday, September 25, 2014)." This list also states that all 157 pages are Cates' notes:

> "The personal notes of Dr. Daniel Cates, Director of Special Education of District No. 211, found in Defendant's Amended Privilege Log of Documents of approximately 157 pages tendered to the trial court and reviewed *in camera* by the trial court,–and in issue in this appeal."[12]

However, this statement contradicts the amended privilege log, dated January 22, 2014, which stated: (1) that pages 145 through 156 are the "personal notes of Timothy Little,

_____

[12]The dash is in the original.

- 12 -

Assistant Principal for District 211"; and (3) that page 157 is an email from Superintendent Thornton to Cates.

¶ 59     Our *in camera* review reveals that, while the DVD is clear and crisp, the photocopies are difficult to read, in part, because of the handwriting and, in part, because of the photocopying process. Pages 1 through 149 and pages 154 through 156 appear to be what defendants indicate that they are, namely, dated handwritten interview notes; pages 150 through 153 contain three student schedules with notes handwritten on the front and what appears to be the back of one of the schedules; and page 157 is an email from Superintendent Thornton to Cates. The two videos on the DVD depict places in the school.

¶ 60     Although defendants' brief was filed on October 30, 2014, which was almost six months after the appellate court had denied their motion for a limited record, and which was after all 40 volumes of the record had been filed, defendants' brief provided a table of contents to the record for only 11 of the 40 volumes. In addition, there were gaps in the table of contents even for the volumes that *were* included. Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005) (an appellant is required to provide in its brief "a complete table of contents" to "the record on appeal"). The appendix to defendants' brief also failed to contain the notice of appeal as specifically required by Illinois Supreme Court Rule 342(a) (eff. Jan. 1, 2005) ("[t]he appellant's brief shall include" in an appendix "the notice of appeal"), and the brief failed to specify the appropriate standard of review, as expressly required by Illinois Supreme Court Rule 341(h)(3) (eff. Feb. 6, 2013) ("[t]he appellant must include a concise statement of the applicable standard of review for each issue, with citation to authority").

¶ 61     This appeal followed.

¶ 62                                        ANALYSIS

¶ 63     Defendants ask this court: (1) to reverse the trial court's discovery order directing the District to produce the contested items; and (2) to vacate the contempt order and fine. In response, plaintiff argues: (1) this court should not consider defendant's claims because, among other reasons, the appellate record is insufficient; (2) in the alternative, if we do address the merits of the appeal, we should affirm the trial court's discovery order; and, (3) whether we affirm or reverse the discovery order, we should not vacate the contempt order and its nominal $500 fine.

¶ 64     For the following reasons, we could reasonably conclude, first, that defendants forfeited the discovery issue on appeal by failing to provide a sufficient record. Specifically, defendants failed to include the transcript of the hearing where the trial court ruled on the underlying discovery issue, which is the sole basis of the contempt order.

¶ 65     Second, the affidavits of Dr. Cates and the reasons stated by the trial court persuade us that the trial court's discovery order was proper. Lastly, we vacate the friendly contempt order and fine.

¶ 66                              I. Interlocutory Appeal

¶ 67     In the case at bar, as in the leading supreme court case of *Norskog* on which defendants rely, "an interlocutory appeal was initiated in the appellate court, pursuant to Supreme Court Rule 304(b)(5) [citation], after defendants refused to comply with the trial court's discovery order[ ], were held in contempt, and were sanctioned." *Norskog*, 197 Ill. 2d at 69. "Because

discovery orders are not final orders, they are not ordinarily appealable." *Norskog*, 197 Ill. 2d at 69. "However, it is well settled that the correctness of a discovery order may be tested through contempt proceedings," and that is what happened both in the case at bar and in *Norskog*. *Norskog*, 197 Ill. 2d at 69 (citing *Eskandani v. Phillips*, 61 Ill. 2d 183, 194 (1975)). "When an individual appeals contempt sanctions imposed for violating, or threatening to violate, a pretrial discovery order," the discovery order itself then becomes subject to review. *Norskog*, 197 Ill. 2d at 69.

¶ 68    "Review of the contempt finding necessarily requires [a] review of the order upon which it is based." *Norskog*, 197 Ill. 2d at 69.

¶ 69                              II. Burden of Proof

¶ 70    "The party who claims the privilege has the burden of showing the facts which give rise to the privilege." *Mlynarski v. Rush-Presbyterian-St. Luke's Medical Center*, 213 Ill. App. 3d 427, 431 (1991). See also *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 119 (1982) ("the burden of showing facts which give rise to the privilege rests on the one who claims the exemption"). Since defendants are claiming the privilege, they must show that they satisfied their burden before the trial court to prove that Cates' notes and affidavit are privileged.

¶ 71    In order to satisfy their burden, defendants submitted to the trial court: (1) the two Cates' affidavits; and (2) the disputed notes and video recording for an *in camera* review. No evidentiary hearing was held. As we observed above, the Cates' affidavits provided no dates, other than to state that Cates was the special education director in October 2005. In his January 16, 2014, affidavit, Cates described only one meeting at which both Cates and counsel were present, and Cates provided no date for the meeting.

¶ 72                              III. Standard of Review

¶ 73    Plaintiff urges us to apply an abuse-of-discretion standard of review, and defendants failed to discuss the appropriate standard of review. Illinois Supreme Court Rule 341(h) (eff. Feb. 6, 2013) dictates what defendants, who are appellants, are required to place in their briefs. The rule states in relevant part: "The appellant must include a concise statement of the applicable standard of review for each issue, with citation to authority, either in the discussion of the issue in the argument or under a separate heading placed before the discussion in the argument." Ill. S. Ct. R. 341(h)(3) (eff. Feb. 6, 2013). Defendants' brief failed to comply with this portion of the rule.

¶ 74    Plaintiff is correct that abuse of discretion is ordinarily the correct standard of review for discovery matters, such as the issue in the instant appeal. However, "[a]lthough a trial court's discovery order is ordinarily reviewed for a manifest abuse of discretion [citation], the proper standard of review depends on the question that was answered in the trial court." *Norskog*, 197 Ill. 2d at 70. "If the facts are uncontroverted and the issue is the trial court's application of the law to the facts, a court of review may determine the correctness of the ruling independently of the trial court's judgment." *Norskog*, 197 Ill. 2d at 70-71. In *Norskog*, the supreme court was "deciding whether disclosure of mental health information [was] prohibited by a statutory discovery privilege and whether any exception to the privilege applie[d]." *Norskog*, 197 Ill. 2d at 71. The supreme court concluded that *de novo* review was

appropriate in the case before it, since these issues were questions purely of law, which normally trigger a *de novo* standard of review. *Norskog*, 197 Ill. 2d at 71.

¶ 75    By contrast, in the case at bar, we are faced with a question concerning the trial court's application of well-established law to the facts of this case. Thus, an abuse-of-discretion standard of review is appropriate. Nonetheless, our decision would be the same under either standard.

¶ 76    In addition, the *Norskog* court held that courts of review may sustain contempt and discovery orders "on any grounds which are called for by the record, regardless of the grounds relied on when the order was entered." *Norskog*, 197 Ill. 2d at 69-70.

¶ 77                                    IV. Forfeiture

¶ 78    As a preliminary matter, plaintiff argues that this court should not consider defendants' claims because, among other reasons, the appellate record is insufficient.

¶ 79    For the following reasons, we could conclude that the underlying discovery issue is forfeited for our consideration. First, we could conclude that defendants forfeited the issue by failing to include the transcript of the January 31 hearing where the trial court decided this issue. The events at the January 31 hearing were the sole basis for the contempt order.

¶ 80    It is the appellant's burden to provide this court with a sufficient record to grant the relief he or she requests on the claims that he or she raises. *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 82; *Chicago Province of the Society of Jesus v. Clark & Dickens, L.L.C.*, 383 Ill. App. 3d 435, 443 (2008). If the appellant fails to do so, we will resolve all doubts arising from incompleteness against the appellant. *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 82; *Courts of Northbrook Condominium Ass'n v. Bhutani*, 2014 IL App (1st) 130417, ¶ 42 (" 'As a general rule, it is the appellant's burden to provide a sufficiently complete record *** and all doubts arising from the incompleteness *** will be resolved against the appellant.' " (quoting *People v. Salinas*, 383 Ill. App. 3d 481, 489-90 (2008))); *City of Chicago v. Jeron*, 2014 IL App (1st) 131377, ¶ 9 ("we will dismiss an appeal if the appellant fails to supply" an adequate record). Without a sufficient record, "a reviewing court will presume that the order entered by the trial court was in conformity with the law and had a sufficient factual basis." *Wackrow v. Niemi*, 231 Ill. 2d 418, 428 n.4 (2008).

¶ 81    Although the trial court spoke generally at the February 21 hearing about the prior discovery order, it may have gone into greater detail or depth at the January 31 hearing when this issue was actually decided. Since discovery orders are generally subject to an abuse of discretion standard, it is useful for a reviewing court to know exactly what a trial court did and said with respect to discovery before deciding whether the trial court abused its discretion.

¶ 82    In addition, plaintiff is correct that the photocopies of Cates' January 16 and February 14 affidavits, which appear in the appellate record, are neither file stamped as received by the circuit court, nor attached to file-stamped documents. Plaintiff questions on appeal whether these documents were reviewed or considered by the trial court. As a result, it would have been useful to view the transcripts for the January 31 and February 14 hearings to determine if these documents were discussed and what, if anything, was said about them.

¶ 83    Thus, we could reasonably conclude that defendants forfeited the discovery issue by failing to provide a sufficient record.

¶ 84    Second, defendants also failed: (1) to include a complete table of contents to the appellate record (Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005) (an appellant is required to provide in its brief "a complete table of contents" to "the record on appeal")); (2) to include the notice of appeal in the appendix of the appellate brief (Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005) ("[t]he appellant's brief shall include" in an appendix "the notice of appeal")); and (3) to include a statement of the applicable standard of review for each issue in their appellant's brief (Ill. S. Ct. R. 341(h)(3) (eff. Feb. 6, 2013) ("[t]he appellant must include a concise statement of the applicable standard of review for each issue, with citation to authority")).

¶ 85    For all of these reasons,[13] we could conclude that defendants forfeited consideration of the discovery issue on appeal. However, we have elected to decide this case on its merits.

¶ 86                              V. Supreme Court Rule 201

¶ 87    The affidavits of Dr. Cates and the reasons stated by the trial court persuade us that the trial court's discovery order was proper.

¶ 88    Defendants argue that the disputed items are protected by both the attorney-client privilege and the work-product doctrine. Supreme Court Rule 201 sets "full disclosure" as the general rule for discovery, with only a few exceptions which are set forth in the rules. Ill. S. Ct. R. 201(b)(1) (eff. Jan. 1, 2013). Rule 201 states: "Except as provided in these rules, a party may obtain by discovery full disclosure regarding any matter relevant to the subject matter involved in the pending action *** including *** the identity and location of persons having knowledge of relevant facts." Ill. S. Ct. R. 201(b)(1) (eff. Jan. 1, 2013). Dr. Cates' notes of his interviews with staff members and others would thus qualify under this rule, unless protected by one of the exceptions "provided in these rules." Ill. S. Ct. R. 201(b)(1) (eff. Jan. 1, 2013).

¶ 89    Defendants argue that the items fall under the exceptions provided in Rule 201(b)(2) for "[p]rivilege and [w]ork [p]roduct." (Emphasis omitted.) Ill. S. Ct. R. 201(b)(2) (eff. Jan. 1, 2013). Subsection (2) provides in relevant part:

        "(2) Privilege and Work Product. All matters that are privileged against disclosure on the trial, including privileged communications between a party or his agent and the attorney for the party, are privileged against disclosure through any discovery procedure. Material prepared by or for a party in preparation for trial is subject to discovery only if it does not contain or disclose the theories, mental impressions, or litigation plans of the party's attorney." (Emphasis omitted.) Ill. S. Ct. R. 201(b)(2) (eff. Jan. 1, 2013).

¶ 90    Thus, the rule defines attorney-client privilege as "privileged communications between a party or his agent and the attorney for the party," and work product as "[m]aterial prepared by or for a party in preparation for trial." Ill. S. Ct. R. 201(b)(2) (eff. Jan. 1, 2013); *Waste*

---

[13]Plaintiff also claims that defendants violated Supreme Court Rule 222(h) because defendants' privilege log failed to state "the exact privilege which is being claimed." Ill. S. Ct. R. 222(h) (eff. Jan. 1, 2011). However, the rule does not require the log itself to state the exact privilege but rather only that the "claim shall be made expressly and shall be supported by a description of *** the exact privilege which is being claimed." Ill. S. Ct. R. 222(h) (eff. Jan. 1, 2011). Defendants stated repeatedly, including in their motion for contempt, that these documents were protected by both the work-product doctrine and the attorney-client privilege. Thus, we do not find this claim persuasive.

*Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 189-90, 196 (1991) (defining the two distinct doctrines). While material subject to the attorney-client privilege is protected against "disclosure through any discovery procedure," work product is discoverable and is protected only if it reveals the attorney's thinking. Ill. S. Ct. R. 201(b)(2) (eff. Jan. 1, 2013).

¶ 91   Although both protections "are provided for in our Rule 201(b)(2)," "they are separate and distinct protections," and we must "address each separately." *Waste Management*, 144 Ill. 2d at 189.

¶ 92                                     VI. Attorney-Client Privilege
¶ 93                                          A. Defined
¶ 94   As noted above, Rule 201 defines attorney-client privilege as "privileged communications between a party or his agent and the attorney for the party." Ill. S. Ct. R. 201(b)(2) (eff. Jan. 1, 2013); *Mlynarski*, 213 Ill. App. 3d at 430 ("confidential communications made by a client to an attorney while seeking legal advice"). Defendants quote our supreme court's definition in *Waste Management*, and we quote it in full:

> " 'The purpose of the attorney-client privilege is to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information.' [Citation.] However, the privilege is not without conditions, and we are mindful that it is the privilege, not the duty to disclose, that is the exception. [Citation.] Therefore, the privilege ought to be strictly confined within its narrowest possible limits. Further, the attorney-client privilege is limited solely to those communications which the claimant either expressly made confidential or which he could reasonably believe under the circumstances would be understood by the attorney as such. [Citations.] Finally, we note that in Illinois, we adhere to a strong policy of encouraging disclosure, with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit." *Waste Management*, 144 Ill. 2d at 190 (holding that the attorney-client privilege did not apply).

¶ 95   In his January 16, 2014, affidavit, Cates stated that he provided only a "summary" of his findings at the meeting which counsel attended. Cates did not state that he created the handwritten notes for the purpose of turning them over to counsel. Cates also did not state that he met with counsel prior to the creation of any of these notes. The affidavit provides no date for the one meeting described in the affidavit where Cates, after completing his fact-finding interviews, "met with Dr. Thornton, Mr. Torres and Mr. Kujawa in the superintendent's conference room to summarize what [he] had gathered and learned." The privilege log indicates that Cates created his notes between September 20, 2005, and September 17, 2007. Defendants are asking us to find that an attorney's attendance at one undated meeting cloaks the director's entire two-years' worth of fact-finding with the attorney-client privilege. The trial court rejected this notion and so do we.

¶ 96   The trial court did carefully excerpt from disclosure the few pages which appeared to relate to consultations with a law firm; and defense counsel acknowledged that the trial court had, in fact, done this in an exchange at the one hearing for which we have a transcript in the record:

> "THE COURT: Just a second. I think I took out anything I saw that involved consultation with your firm. I think I told [your associate] that last time.
>
> KUJAWA: Yes, you did.
>
> THE COURT: So it's nothing involving a direct conversation between you as the attorney and the client in what I ordered to be turned over."

Counsel then stated that his point was that "Dr. Cates began his work *** after counsel had already been retained." But fact-finding after retention of counsel is not the same thing as attorney-client communication. Ill. S. Ct. R. 201(b)(2) (eff. Jan. 1, 2013) (defining the attorney-client privilege as covering "privileged communications between a party or his agent and the attorney for the party"). Thus, none of the notes which the court ordered disclosed involved a communication between an attorney and a client, and they are not subject to the attorney-client privilege which, our supreme court has held, "ought to be strictly confined within its narrowest possible limits." *Waste Management*, 144 Ill. 2d at 190.

¶ 97                                B. Controlling Cases

¶ 98    On appeal, defendants argue that "this case is controlled by the supreme court *Consolidation Coal* and appellate court *Mlynarski* cases." *Consolidation Coal*, 89 Ill. 2d at 112-21 (discussing attorney-client privilege); *Mlynarski*, 213 Ill. App. 3d at 430-32 (same). While both cases involved the attorney-client privilege, *Mlynarski* held that the privilege applied to the facts before it. *Mlynarski*, 213 Ill. App. 3d at 430-32.

¶ 99    In *Mlynarski*, a patient slipped and fell in a hospital on April 1, 1987, and later died. *Mlynarski*, 213 Ill. App. 3d at 429. A coordinator in the hospital's "Risk Management Department" contacted counsel, sending three memos. *Mlynarski*, 213 Ill. App. 3d at 429. The first two memos were held to be privileged but the trial court ordered a third memo produced. *Mlynarski*, 213 Ill. App. 3d at 430. The third memo to counsel was sent on April 16, just two weeks after the accident, and it included summaries of statements from persons that the risk coordinator had interviewed in those two weeks. *Mlynarski*, 213 Ill. App. 3d at 430.

¶ 100    The appellate court stated that "[t]he attorney-client privilege protects confidential communications made by a client to an attorney," and that "the question" before it was "which employees" of a corporation were entitled to this privilege. *Mlynarski*, 213 Ill. App. 3d at 430. After concluding that the coordinator was part of the hospital's "control group," the appellate court held the memo privileged. *Mlynarski*, 213 Ill. App. 3d at 431-32.

¶ 101    By contrast, in the case at bar, the question is, first, whether the notes were even communications made to an attorney. Cates does not state that his handwritten notes were intended to be communications to an attorney or that they were sent to the attorney prior to this discovery dispute. They were, as he swore in his affidavit, part of the fact-finding mission that he was assigned by his supervisor. At most, they could be work product, which we discuss below. Thus, defendants failed to satisfy their burden of proving that the notes were covered by an attorney-client communication.[14] *Consolidation Coal*, 89 Ill. 2d at 119

---

[14]Defendants' briefs contradict themselves as to whether Cates made the notes, in part, for his own "personal reasons." In defendants' response to plaintiff's motion to compel, filed in the trial court on November 14, 2013, defendants stated that Cates made the notes "for both personal reasons and

- 18 -

(the party claiming the attorney-client privilege "must show certain threshold requirements" including that the document was a "communication \*\*\* made to an attorney").

¶ 102    As in *Mylnarski*, *Consolidation Coal* stated that, with respect to the attorney-client privilege, the question before it was solely "[t]he question of who speaks for a corporation on a privileged basis." *Consolidation Coal*, 89 Ill. 2d at 112. Thus, as with *Mylnarski*, *Consolidation Coal* started off with the assumption that the report at issue was, in fact, a communication made to an attorney. Since, in the case at bar, defendants failed to satisfy their burden of proving this "threshhold" requirement of a "communication \*\*\* made to an attorney," neither *Mylnaraki* nor *Consolidation Coal* supports defendants' claim of attorney-client privilege.

¶ 103    However, even if Cates had communicated all 144 or 157 pages of his fact-finding notes during the one summary meeting which he attended with an attorney, defendants have still failed to prove that Cates was part of the "control group," whose communications are entitled to the attorney-client privilege. *Consolidation Coal*, 89 Ill. 2d at 118-21 (discussing what is a control group); *Mlynarski*, 213 Ill. App. 3d at 431-32 (same).

¶ 104    With corporations and other organization, courts must define which employees qualify as the "client," such that communications between an attorney and those employees will qualify for the "attorney-client" privilege. *Mlynarski*, 213 Ill. App. 3d at 430. See also *Consolidation Coal*, 89 Ill. 2d at 112. In Illinois, our supreme court has adopted the "control-group test" to answer that question. *Consolidation Coal*, 89 Ill. 2d at 118-19. See also *Mlynarski*, 213 Ill. App. 3d at 431-32.

¶ 105    Two tiers of employees qualify as the control group: (1) "top management who have the ability to make a final decision"; and (2) employees who advise top management in a particular area such that a decision would not normally be made without their "advice or opinion," and whose "opinion" forms the basis of any final decision made by those with actual authority. *Consolidation Coal*, 89 Ill. 2d at 120; *Mlynarski*, 213 Ill. App. 3d at 431 (discussing the "two tiers"). With respect to the second tier, our supreme court drew a distinction between "opinion" and "information." *Consolidation Coal*, 89 Ill. 2d at 120; *Mlynarski*, 213 Ill. App. 3d at 431 ("opinions and advice" distinguishes the control group) Thus, while employees whose "opinion" forms the basis of a decision are part of the control group, "individuals upon whom [top management] may rely for supplying information are not members of the control group." *Consolidation Coal*, 89 Ill. 2d at 120.

¶ 106    In *Mlynarski*, this court held that defendant had satisfied its burden of proving that an employee was a member of the control group, where defendant submitted an affidavit from the employee's supervisor which stated that " '[a]ll settlement decisions made with respect to litigated and non-litigated claims \*\*\* are made jointly' " with this employee; that this employee is " 'consulted from time to time' " by counsel " 'to determine what legal action' " to pursue; and that his " 'advice and opinions' " form " 'part of the basis for any decision to settle or litigate the matter.' " *Mlynarski*, 213 Ill. App. 3d at 431.

---

professional growth, and in anticipation of litigation." By contrast, in the reply brief filed in this court, defendants stated: "Plaintiff is mistaken [in suggesting that Cates had personal reasons for making the notes]. Dr. Cates had no reason to conduct his informal investigation into anticipated litigation for his own personal reasons." We know of no case that protects notes made for "personal reasons and professional growth."

¶ 107 By contrast, in the case at bar, Cates submitted an affidavit in which he stated (1) that he attended one meeting which an attorney also attended; and (2) that he was assigned a fact-finding mission by his supervisor. Thus, defendants have failed to satisfy their burden of showing that Cates was a member of the control group.

¶ 108 With respect to the video recordings, Cates' affidavit stated only:

> "11. In addition, I created a video file of the pathway that I believed the student might have taken in order to get to the location where the alleged events were reported to have taken place. This video was shared one time only during the summary meeting held with Dr. Thornton, Mr. Torres and Mr. Kujawa. It was never shared with anyone at any other time."

¶ 109 Cates did not state that he created this video file at the direction of counsel or for the purpose of communicating it to counsel. Cates stated simply that he "created" it and later "shared" it.[15] Cates provided no date in his affidavit for the recording's creation or for the meeting at which it was shared or for the date counsel was retained. There is also no date for the recording: (1) in the privilege log; (2) on defendants' "Master List" for the supplemental record; or (3) in the audio or video portion of the recording itself. The DVD contains two files, with the first one listed on the computer file as "10/11/2005 8:38 a.m. Movie Clip," and the second one listed as "10/11/2005 8:51 a.m. Movie Clip." However, there is no indication who input these dates on the copy that we have. Thus, defendants have failed to satisfy their burden to show that the video was an attorney-client communication.

¶ 110 In sum, defendants failed to satisfy their burden of showing that these items qualified as a communication to an attorney or that Cates qualified as part of the control group. Since defendants cannot avail themselves of the attorney-client privilege, we discuss the work-product doctrine next.

¶ 111                                    VII. Work-Product Doctrine

¶ 112 Second, defendants argue that the disputed items are also protected by the work-product doctrine. As Rule 201 states, work product is "[m]aterial prepared by or for a party in preparation for trial," and it "is subject to discovery only if it does not contain or disclose the theories, mental impressions, or litigation plans of the party's attorney." Ill. S. Ct. R. 201(b)(2) (eff. Jan. 1, 2013); *Waste Management*, 144 Ill. 2d at 196.

¶ 113 While the work-product doctrine applies to a "broader" array of materials than the attorney-client privilege, it is less of a shield than the attorney-client privilege. *Waste Management*, 144 Ill. 2d at 196. "[O]rdinary work product" is "freely discoverable" (*Waste Management*, 144 Ill. 2d at 196), and it is defined as "any relevant material generated in

---

[15]Although defendants, in their response to plaintiff's motion to compel, asserted that "the video was shown to defense counsel Michael Kujawa within minutes of it being taken," defendants did not support this assertion with an affidavit or other citation to the record. Similarly in their reply brief to this court, defendants asserted that the video was "done at defense counsel's direction," but without providing a citation to the record. *Paoletti v. Industrial Comm'n*, 279 Ill. App. 3d 988, 999 (1996) ("A brief, however, is not evidence ***."); *Ferguson v. White Oak Coal Co.*, 202 Ill. App. 160, 166 (1916) (refusing to consider a fact that was merely "stated in defendant's brief"). See also *City of Des Plaines v. Metropolitan Alliance of Police, Chapter No. 240*, 2015 IL App (1st) 140957, ¶ 34 (a party's brief must support its allegations about evidence with citations to the record).

preparation for trial which does not disclose 'conceptual data' " (*Waste Management*, 144 Ill. 2d at 196 (quoting *Monier v. Chamberlain*, 35 Ill. 2d 351, 360 (1966))). By contrast, "[o]pinion or 'core' work product" is defined as "materials generated in preparation for litigation which reveal the mental impressions, opinions, or trial strategy of an attorney." *Waste Management*, 144 Ill. 2d at 196. Even this opinion or core work product is discoverable "upon a showing of impossibility of securing similar information from other sources." *Waste Management*, 144 Ill. 2d at 196 (holding that the work-product doctrine did not protect the documents at issue).

¶ 114　　Here, we have memos made by a party's employee concerning possible witnesses. With respect to memos made by counsel, our supreme court has distinguished between: memos made by counsel of his or her impressions of a prospective witness, which are protected; and verbatim statements of the witness, which are not. *Consolidation Coal*, 89 Ill. 2d at 109 ("memoranda made by counsel of his impression of a prospective witness" are "distinguished" from "verbatim statements of such witness" (citing *Monier*, 35 Ill. 2d at 360)). In *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 109 (1982), our supreme court considered whether counsel's notes of employees and witnesses' oral statements, which were not verbatim and not reviewed or corrected by these individuals, were protected under the work-product doctrine. *Consolidation Coal*, 89 Ill. 2d at 109. The court held that an attorney's notes "regarding oral statements of witnesses, whether in the form of attorney's mental impressions or memoranda, necessarily reveal in varying degrees the attorney's mental processes in evaluating the communications." *Consolidation Coal*, 89 Ill. 2d at 109. By contrast, in the case at bar, the notes at issue were not done by the attorney and thus do not "reveal *** the attorney's mental processes in evaluating [his] communications" with the witnesses. *Consolidation Coal*, 89 Ill. 2d at 109.

¶ 115　　In the case at bar, no one disputes that Cates was engaged in a fact-finding mission assigned by his work supervisor. In this way, his legal pads are similar to the notebooks which the supreme court held in *Consolidation Coal* were not work product. *Consolidation Coal*, 89 Ill. 2d at 112. In *Consolidation Coal*, our supreme court considered not only interview notes made by attorneys (which we discussed above), but also the notebook of an employee who was assigned a fact-finding mission about the accident at issue. *Consolidation Coal*, 89 Ill. 2d at 111, 121. Holding that the notebook was not attorney work product, our supreme court explained:

> "It does not reflect or disclose the theories, mental impressions or litigation plans of [defendant's] attorneys. Nor is it the product of the attorneys' mental processes. Sailors[, the employee,] never communicated with the legal department prior to preparing this material, nor was he advised by his superior, who had requested Sailors' help, as to what the theories or plans of the attorneys were relative to this litigation. He was simply asked to analyze pieces of the machinery and render an opinion as to what had occurred. When his report was transferred to the legal department some six months to a year after it had been made, it did not, as [defendant] argues, thereby become part of the attorneys' thought processes." *Consolidation Coal*, 89 Ill. 2d at 111-12.

¶ 116　　As the trial judge observed in the case at bar, Cates' notes and video are "analogous to the Sailor report." To the extent that they reflected the "mental impressions" of the attorneys, he exempted them from production. See *Consolidation Coal*, 89 Ill. 2d at 111-12. Cates did

not state in his affidavit that he "communicated with the legal department prior to preparing this material" or that he was "advised by his superior *** as to what the theories or plans of the attorneys were relative to this litigation." *Consolidation Coal*, 89 Ill. 2d at 112. Cates was "simply asked to analyze [the] pieces" and "render an opinion as to what had occurred." *Consolidation Coal*, 89 Ill. 2d at 112. When he summarized his results to his supervisor, at a meeting which the attorney also attended, his notes and video did not "thereby become part of the attorneys' thought processes." *Consolidation Coal*, 89 Ill. 2d at 112. Pursuant to the holding of *Consolidation Coal*, these items are "therefore not entitled to protection under the work-product doctrine." *Consolidation Coal*, 89 Ill. 2d at 112.

¶ 117    Neither *Consolidation Coal* nor *Mlynarski*, which defendants maintain are controlling in this appeal, helps defendants, and we are thus not persuaded by defendants' work-product argument.

¶ 118    With respect to the video, plaintiffs also argue that producing it would be like "ordering the Chicago Bears to produce their 'Playbook' of all plays" to the Green Bay Packers. Actually, it is more like allowing the Packers to view the playing field. Since plaintiff has not viewed the video, she is not in a position to argue that it is impossible for her to now observe at the school what was depicted in the video, and impossibility is an exception to the work-product doctrine. *Consolidation Coal*, 89 Ill. 2d at 111 (recognizing an "exception" to the work-product doctrine when it is not possible to secure similar information from other sources). Since our decision may be further appealed, we do not want to discuss the content of the video, except to say that it shows movable items that may or may not still exist. Thus, with respect to the video, the impossibility exception is yet a further reason not to apply the work-product doctrine.

¶ 119                          VIII. The Civil Contempt Finding

¶ 120    Lastly, we must consider the civil contempt finding, which plaintiff asks us *not* to vacate and which defendants ask us *to* vacate.

¶ 121    Whether a contempt finding should be vacated is a question to be determined on the individual facts of the particular appeal. *Consolidation Coal*, 89 Ill. 2d at 122. In *Consolidation Coal*, for example, the supreme court ruled that, "[s]ince" some of the notes and memos were not discoverable and the case involved "issues of first impression," the court would set aside the contempt finding ordered by the trial court. *Consolidation Coal*, 89 Ill. 2d at 122 ("the circuit court's order imposing a fine on [defendant's] attorney for contempt of court will be set aside"). See also *Sarver v. Barrett Ace Hardware, Inc.*, 63 Ill. 2d 454, 462 (1976) ("[s]ince the issue involved in this case is one of first impression in this State, that part of the order of the circuit court imposing a fine on the attorney for the plaintiff is vacated").

¶ 122    By contrast, in the case at bar, there were no issues of first impression or close legal questions to be resolved, and we are affirming the trial court. In addition, defendants failed: (1) to include a complete table of contents to the appellate record (Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005) (an appellant is required to provide in its brief "a complete table of contents" to "the record on appeal")); (2) to include the notice of appeal in the appendix of the appellate brief (Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005) ("[t]he appellant's brief shall include" in an appendix "the notice of appeal")); and (3) to include a statement of the applicable standard of review for each issue in their appellant's brief (Ill. S. Ct. R. 341(h)(3) (eff. Feb. 6, 2013)

("[t]he appellant must include a concise statement of the applicable standard of review for each issue, with citation to authority")).

¶ 123　　Our supreme court has admonished: "The rules of this court are not suggestions; rather, they have the force of law, and the presumption must be that they will be obeyed and enforced as written." *People v. Campbell*, 224 Ill. 2d 80, 87 (2006) (citing *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995)). Since supreme court rules are "not mere suggestions" and "are mandatory," "this court possesses the discretion to impose appropriate sanctions for violations." *Pickus Construction & Equipment v. American Overhead Door*, 326 Ill. App. 3d 518, 520 (2001). In addition, our supreme court has held that courts of review may sustain contempt and discovery orders "on any grounds which are called for by the record, regardless of the grounds relied on when the order was entered." *Norskog*, 197 Ill. 2d at 69-70.

¶ 124　　However, when an attorney's noncompliance with a discovery order is based on a good faith effort to secure an interpretation of an issue to serve his or her client and the court, a civil contempt finding should not stand. In weighing the lawyer's disregard of our rules against the serious consequences of contempt, we exercise our discretion to vacate the contempt finding and the $500 fine.

¶ 125　　　　　　　　　　　　　　　　CONCLUSION

¶ 126　　For the foregoing reasons, we affirm the trial court. Defendants have failed to satisfy their burden to show that either the attorney-client privilege or the work-product doctrine applies. The two cases, which defendants argue are controlling in this appeal, support the trial court's ruling. In addition, we vacate the contempt finding and the $500 fine imposed by the trial court.

¶ 127　　Affirmed; civil contempt finding and the $500 fine vacated; and the case remanded for further proceedings consistent with this opinion.